The next case for argument is INREHypodermic Products Antitrust litigation. My understanding of, and correct me if I'm wrong, Mr. Kirstein, is that rather than the time as set forth on the schedule in our minutes here, you will present for 12 minutes, and Mr. Silverman will do three minutes then as rebuttal. Is that correct? That's correct, Your Honor. All right. Thank you very much. That's permitted. You may proceed. Good morning, Your Honors. I'm Bruce Kirstein, and I represent the distributive plaintiffs in this matter. Since the district court's ruling, this court's decision in Warren General was handed down. That was the last of a series of decisions by various courts deciding the issue of whether a health care provider purchasing under a GPO contract conveyed direct purchaser standing to the health care provider that purchased through a distributor. The other cases were Delaware Valley in the Ninth Circuit and St. Francis, which was a district court decision affirmed in the Eighth Circuit. Each of the courts looked at the mechanics of the transaction, and that they determined that so long as the health care provider purchased through a middleman, the health care provider was an indirect purchaser and the distributor was the direct purchaser. We submit that the Warren court's decision is dispositive here. It answers the court's question under 1292B where it is on all fours. Were there any agency allegations in the Warren General case? In effect, Your Honor. In effect. And the reason I say that is – Doesn't that make it less than all fours? Well, no. And the reason I say that is there is no agency exception in this circuit. Dens probably addressed that directly. So the argument was whether there was ownership and control, which is the only exception. And if I understand it correctly – What is the difference between the agency relationship and the ownership and control relationship? Well, the various courts in Hanover, Hsu, Illinois, Brick, and then Utila Corp. said that there has to be a total totality of interest, a parent sub. There has to be complete control. And if, in fact – Enforcing the corporate bail sentence? Effectively. There has to be such a totality of interest that would be there. And it was specifically requested of the court in Dens' plight to divert from and create effectively a new exception. The Supreme Court in Utila Corp. said there are no exceptions other than two. A cost plus requirement contract, so it has to be a fixed amount plus cost plus, which we don't have here and nobody's claiming here. And two is ownership or control. But there's been a lot of confusion about the facts, and I think it's important to actually look at the facts. Let's stick with Warren for just a moment. In Warren, didn't the distributor also establish the price? In Warren, the distributor establishes the price here also. That was the point. They're arguing that the distributor doesn't establish the price, but the distributor does. The way the distributor works is, and every distributor works the same way, we have a base price plus an upcharge. The upcharge is negotiated specifically between – Yeah, but the base price has been negotiated between Becton and the hospitals. Right, but that's no different, for example, when Becton sells – Factually, isn't there at least a difference in Warren? No. You don't think there is? It's exactly the same. It works exactly the same for all of these. If you think about it and just step back, and they admit this at page 14 of their brief if you look back at it, Becton goes out and invoices the distributor. It invoices the distributor for the average wholesale price, the higher price. If, in fact, the goods are taken into the distributor's inventory, titles transferred to the distributor, the distributor pays for the goods. They acknowledge if, in fact, the – and they use the word distribute. If the distributor distributes it to a – specifically to a healthcare provider, at that point, if the distributor establishes to specifically the supplier, in this case Becton, that they were qualified under the program, then there's a rebate. But all goods are handled exactly the same, go into inventory the same, go commingled in inventory. I wanted to ask you about that while you're on that point, factually. When the distributors actually acquire the products from Becton, do they know which of those products are going to be sold in contract sales? No. They all go into inventory. They order. They acknowledge also in their brief that the distributors buy on their own estimates. In other words, they do their demand estimates for totality. They take the risk of loss. They deal with this. There's a confusion about the agency, and if I can explain why, and I think it's very, very important to understand the factual setting. They admit in their briefs that the operative documents, the documents between, in one case, the supplier and the GPO, which would be Novation in this case, and then a second document, an agreement between Novation and the authorized distributor, which would be, in MedStar's case, Cardinal. So you have two contracts that were signed, which, in theory, the health care provider's agent were party to. That's where the price comes in. In both those agreements, specifically, it provides in the first agreement between the GPO and Becton that the Becton will make product available to the authorized distributor for purchase to be resold specifically to the member, which is the health care provider. In the second agreement that the GPO signs with the authorized distributor, in this case it's Cardinal, it specifically provides that Cardinal will sell the product to their members pursuant to those terms, and that would be the basic base price plus whatever is negotiated for the upcharge. What happened was, specifically, there was a third document. It's called an agreement, but it was the dealer notification. That is a document between, specifically, the Becton sent out to the authorized distributors. And this is very, very important to understand conceptually what happened. They were concerned about retail price maintenance, and it's referred to in the brief. So what they did was, and the important point is that neither the GPO or the health care providers are party to it if you wanted to call it an agreement. This is totally between Becton and the suppliers, and it would be inconsistent with the actual contracts that the GPO entered into. But they weren't even party to it. What they did was specifically set up, instead of having two steps of the transaction on paper, where specifically the seller, the supplier, Becton, sells to the distributor cardinal who resells to the health care provider, in this case MedStar, they set up three steps. And this is critical. If you look at page 21 of the district court's opinion, it specifically refers to a manual that describes the transaction in the three steps. It says specifically step one. And it talks about in the premise that they're trying to avoid retail price maintenance. Step one, the product is sold by Becton to the distributor. Title passes to the distributor, and product, which may be eventually sold under a rebate contract, is not physically distinguished from other Becton products. It's taken into the inventory of the distributor. Step two, the product is shipped by the distributor to the customer. Upon shipment, title passes to Becton. The product is repurchased by Becton. The risk of loss to either the product, loss in transit, or uncollectible seals is Becton. That's the second transaction. And then it talks about a third transaction where Becton resells the product to MedStar. Do you think that Judge Linares was concerned or troubled by these steps that had been taken in fashioning this agreement? He might have been. I can't get into his mind, but I will say this. One is he used a different legal standard. Page 22 of his opinion, he says, the Court gives Becton the benefit of the doubt that its present arguments are not meant to imply that it previously was intentionally trying to skirt antitrust laws. I understand he made his comments. We weren't party to that. I'm the distributor. I've taken the position throughout. But there's something more than that. The entire agency argument comes up in the third step. The argument that they're seizing is you became an agency. Under the trilogy of cases, Hanover Shoe, Illinois Brick, and Utilicorp, do you think that Judge Linares was overly concerned about the use of the term servicing agent? I think he was. I don't think it's an exception. But it doesn't affect the first transaction. One of the problems, and we wrote this in our brief and nobody has responded to it, is under the first step, when we buy it, we're invoiced, we take ownership of the property, we pay for it, we have a claim as a distributor. The claim under Hanover Shoe occurs, that's the moment we purchase it. Somehow we're being divested by what is specifically finding is downstream sales. First of all, I believe that this whole basic notification is a fiction. There's not a single internal document actually to the establishing it, for example, transferring back title in any of the agreements, et cetera. What happens is it's clearly downstream. The first step answers the entire Utilicorp issue. Who is the immediate buyer? The moment you purchase, any resale is irrelevant to it. Actually, the one thing I don't understand is how do you become a distributor? Who designates, how does that relationship between the title tell about? There are two contracts I just explained, I just mentioned. There's contracts between the GPO and the seller and then between the GPO and the distributor. Is the GPO picking the distributor or is Beckton? Well, they both are. One is GPO authorizes who would be able to apply, and Beckton also accepts an authorized distributor. Who takes the initiative? Well, there are contracts going, simultaneous contracts. And what's an authorized distributor? An authorized distributor. Who gives that authorization? It's like any other industry is. If I'm a seller of General Motors car, I'm an authorized seller of General Motors car. They've accepted me. I've agreed to the terms of those agreements be with the GPO. Not the deal of notification. Those are the binding agreements. As a matter of fact, they have a merger clause that says that anything that's inconsistent with those is invalid. Well, the deal of notification would be invalid. But there is, it's a fiction. It never actually was implemented. And what defendants do is they try to conflate facts because they recognize two things. Judge Linares originally applied an economic substance test to determine who was the economic actor. He recognized other courts like Delaware Valley applied the immediate buyer test, which we believe is absolutely consistent with the Utilicorp line of cases. But Warren General closed that down. I was going to ask, what is the viability of an economic substance test post-Warren General? It doesn't exist. It didn't exist before. He was relying on language in, specifically in Densply, which actually applied the mechanics of the purchase test. But they threw in a line, but it also meets the economic substance of the transaction. It was a throw-in line that the court had. Judge Linares seized on that and said, I want to look deeper and have scrutinized it. The line of cases that had a machine. I'm not familiar with the term of our throw-in line in describing Court of Appeals' opinions, but I'll take that under advisement. I apologize for that, Your Honor. I'm joking. But I understand that. But it was very specific about how they judged it, and it was exactly consistent with Warren. Warren wasn't making new law. Warren was actually following exactly what Densply did. The circumstances are identical. I see that my time is up. We'll have Mr. Silverman on rebuttal. Thank you. Thank you very much, Mr. Pearson. Mr. Wyatt. Good morning, Your Honor. Good morning. Maybe I should start by talking a little bit about our view of Warren General. Warren General, I think, was actually correctly decided, and I think the court there did an economic realities analysis in the favor of competing. They were competing claims, and the reason I say it was correctly decided is you were correct, Judge Fischer. The distributor used by Warren General was the resale. There was evidence in the record that that distributor set the price. The only claim Warren General made to being a direct purchaser was Warren General was able to file for a rebate on the volume. It had a contract. You were entitled to file for rebates on a certain volume of purchases. Much like, as the panel hearing the case said, it's much like buying shampoo at the grocery store. If you get a rebate coupon and you can send it in, that doesn't make you the direct purchaser of the shampoo. The grocery store was the direct purchaser of the shampoo for purposes of an antitrust claim. So Warren General, I think, is correct, and I have no disagreement with the bright line rule that everyone keeps advocating. The question is, who was the purchaser? And that was the question Judge Linares dealt with. Who's the purchaser on contract sales? Now, there's some unique facts here. One of the unique facts is Becton is a monopolist, and it has monopoly products that every distributor wants, and every distributor will want in their inventory. Becton has two arrangements with authorized distributors, and Becton has a veto right as to who can be an authorized distributor. The first arrangement is they sell to the authorized distributors at what they call the highest price, the reseller price was the testimony of their 30B6 witness. He gets that price, and he can then resell that. That is the reseller price. He gets into his inventory what the hospitals are going to order. When that goes into his inventory, actually when he receives a shipment, Becton recognizes revenue at the hospital price on part of that shipment and at his price. So he has a dual function. He is the delivery agent and the servicing agent for the sales Becton is making at the price Becton has negotiated, and he's an independent wholesaler under a completely separate agreement when he's selling in his own account. And that was what Judge Lanari spent an enormous amount of time. He looked at all the evidence. He looked at all the agreements. He read the agreements. He looked at the testimony concerning the agreements. He looked at the two unrebutted expert reports we put before him, and he said the hospitals are buying directly from Becton, and to Your Honor's point this morning, that's where the title transfer and the documentation, which Mr. Gerstein read into the record, is important. In the dealer agreement between Becton and the distributors, to be a distributor at Becton you have to agree that you're going to go through that process. You're going to store their inventory. You're going to go collect their money. You're going to send your money. You're going to send that to the hospital. You're going to collect Becton's money. You're going to remit to Becton. Now, there's been a lot of conversation in this courtroom about payment. The testimony from Becton was very clear. A distributor, even though he's invoiced at the highest price for whatever he receives in the inventory, Becton recognizes revenue separately. They recognize revenue on the percentage of inventory he's going to resell. They recognize a lower level of revenue on what's going to be shipped to the hospitals at two different price points. And the point of that would be that Becton knows, and so does the distributor, a part of what's sitting in my warehouse for Becton's account is going to go out to a hospital in three to five days, and I have to go collect Becton's money. Even though he receives an invoice saying all this inventory is at a higher price, the testimony from Becton's 30B6 witness was no distributor ever has to pay that gap. That is, there is no out-of-pocket to the distributor. I mean, I follow you on this, but it seems to me the critical issue, and going back to what Mr. Gerstein was saying, when does title change hands? If it isn't title, what we should look at as the test in terms of whether there is, in fact, a first sale? Does it matter whether title shifts back and forth as long as title shifts? I believe title is but one of multiple indicators here, and I believe this issue has most recently been addressed by a court of appeals, and we're a little bit remiss in not briefing it more fully, and the value test of Charlotte Incorporated case would be Vare Corporation. The title is an issue this court should focus on. Judge Linares did focus on it, which is I'm transferring title to you. I'm now taking – when my customer orders, title returns to me, and I'm delivering title to the hospital. So the title did move, and to Mr. Gerstein's point, it is a factor, but Judge Linares looked at it and said that's not a sale, that first transaction. It's a factor if you apply Judge Linares' test. Is it a factor under Warren Hospital? Is Warren Hospital a little bit more black and white in that sense? Oh, I think it's completely black and white. The distributor negotiated the price. The distributor could set the price anywhere the distributor wanted to set the price. The distributor bought it into his inventory and then sold it to the hospital, and then Amgen came and the distributor played Amgen a wholesale price. Then Amgen comes to the hospitals and says we'd like for you to be in a rebate program. You buy more of this, you send us proof you've bought it, and we'll send you money. But there was no agency arrangement of the type here. This is one of the unique characteristics of this case, and it distinguishes it from all the cases. Here you have a monopoly seller, Becton, dictating a term to a distributor, which is the agreement that you will sell this, you will deliver this as my servicing agent at a price I've negotiated which is lower than the price I sell to you. You will collect my money and you will remit, and you will make no money on the transaction. You will sell and you will remit to me my money. Now, why would a distributor do that? There's testimony in the record that explains that. The distributor wants access to the hospitals so that he can sell other things into the hospital. He's got his own line. Many of them have their own line of goods and they want access, and they know the hospitals are going to order Becton. They want to be Becton's selling agent. Yeah, but as to these Becton products, as to the Becton products that they take possession of, regardless of title, let's talk about risk of loss. Yes, Your Honor. I mean, the distributors have the risk of loss. They have absolutely no risk of loss, Your Honor, on the contract sales. Well, there's a sales risk. If the hospitals decide to purchase only 90 percent instead of 100 percent, they have 10 percent left. Well, that's covered in the contracts. Anything the hospitals reject can be returned to Becton. What happens to that 10 percent? The 10 percent can be returned to Becton. There's a language in the contracts that specify the circumstances that if the customers don't want it, if it's rejected, it can be returned to Becton. There's somewhat of an opaque language in the contract about return rights, but Mr. Goldman in his testimony. What about if the warehouse where the items are stored burns down and the insurance policy had lapsed the week before? Who has the risk of loss on the product? Well, as I understand, we never got to the issue of Becton's insurance policy, but the warehouseman does insure it. He has the risk of damage to the property when it's in his warehouse. Now, he has the ability to return the property ordered for Becton's contract sales to Becton. That's the testimony. If the hospitals don't want it, but this is a very – Whether or not there is insurance is not dispositive of whether or not the distributor has risk in the sense of that term. That's right, and he has absolutely no market upside, which is the most important point. He cannot buy at the prices the hospitals buy at. If he takes all that into his inventory and can't sell it without the ability to return it, he can't resell it. The hospitals constitute 74% of the market. They're ordering syringes daily, but the price point to the distributor, the one that Becton calls the authorized reseller price, is always higher than the price to the hospitals, and Becton is very diligent. They will not – they have the distributor police the hospitals to make sure that the hospitals aren't reselling. So Becton's intent, as they testified, is there are multiple price points in the market. We sell to the distributor at what they call the reseller market price, and they sell to the hospitals at a lower price, and in that scenario, they have carefully converted the distributor into an agent, and the value pass case and Judge Lanieri's correctly understood why. Becton, in 1964, signed a consent decree, much like General Electric signed at the turn of the century with the United States, and they agreed not to engage in resale price maintenance. There's an exception in their consent decree, as there is an exception in the law. One can't engage in resale price maintenance with an agent. Your agent is you. So Becton converted for purposes of pricing. The agents have the right to – the distributors can resell to a segment of the market, but as Judge Lanieri's correctly pointed out, Becton's a sophisticated party, and had they been – they clearly drafted the agency document with clear intent of defending themselves against resale price maintenance claim, because in that capacity, the distributor as an agent is Becton and can't conspire with Becton for Section 1 purposes. That's the passage you read, Your Honor, earlier in Judge Lanieri's opinion. Now, what happens here? Along comes a change at the Supreme Court. Resale price maintenance as of 2007 is no longer per se illegal. Now it's rule of reason, and all of a sudden, Becton begins to distance itself from the positions it's taken throughout the litigation. But the facts are the facts. Maybe the consequences of not having agents is no longer so dire if you're accused of resale price maintenance, but they're still in an agency relationship, or an agency relationship the whole time. And Judge Lanieri's found the agency relationship continued even after they took the word in 2006, servicing agent out, and changed it to distribution agent. And so they were basically an agent for purposes of the sale of this product. Anything related to this? Just so I can get one thing off the table. You're not now disagreeing with Judge Lanieri's conclusion that judicial estoppel, while aspects of it may have been relevant to his thinking, is not operative? We're not pressing the judicial estoppel point, Your Honor. It has something to do with some of the issues related to Becton's representation have something to do with the timing of when we amended our pleading, since some of this was opaque to us. But judicial estoppel we're not pressing here. I do think that taking the service agency document at its face value, you wouldn't argue that the distributors fall under the control exception. We did not argue that below. We are simply arguing that they are Becton's agent. When we buy from them, we're buying from Becton. However, wherever title goes, they're an agent. As an agent, they're a principal. The agency is very carefully defined. The agency law is as old as the hills, and if you take Mr. Gerstein's point of view here about Illinois brick rights all this out, then you don't get the GE result in 1922 in the U.S. Supreme Court, and you don't get the value passed result in the Fourth Circuit, which is people routinely defend these Section 1 claims for conspiracy to engage in resale price maintenance. He's my agent. He's me. You can't conspire with me. That's what this agency was constructed so that in these contract sales, if anybody had charged resale price maintenance, it would have been invoked as just when it is correctly recognized as a defense. I can't conspire with myself. And so on the sale, to the extent they're Becton's agent and they claim they're selling to us, they're selling to us in the capacity of Becton's agent. The agency issue gives us the first purchase here. We're the immediate purchaser through Becton and or its agent, but there's no resale by an independent purchaser here. If there are no further questions, I'm sure I've overrun my time. Thank you, Your Honor. Thank you very much, Wyatt. Mr. Silverman. Thank you, Your Honors. Moses Silverman. I represent Becton Dickinson. I'd like to make three points if I can. First, with respect to the dealer notification form, whatever it means, it did not wipe out the first sale. The first sale took place between Becton and the distributors. There is no issue about that. There was risk of loss, and as Judge Smith asked in his question, when the distributor took that into inventory, it was the distributors at that time. Nothing in the dealer notification form changes that, and nothing changes the mechanics of the transaction. There isn't any actual repurchase by Becton from the distributor and resale. No documents, no money changes hands. And it also, with respect to the agency point, the key cases I believe are Rekordex and Densply in this circuit. Rekordex at page 853, and Densply at page 371, say whether or not you're talking about and you call someone agent isn't relevant. It's whether you control them, and my friend just acknowledged that they are not asserting we control Cardinal. Obviously, we don't. Cardinal is one of the largest companies in the world. We're a large company. They're much larger. They are a major distributor of all medical and surgical products, and nothing changes in the dealer notification form, changes the admissions. Nothing changes their pleading. At Joint Appendix 141, paragraph 16, where they say they purchased through Becton Dickinson, their words, and this court in Densply at page 363 said, that means if you purchase through someone, you're the second purchaser. The person you got it from is the first. It doesn't change the language of the new dealer acquisition agreement, which is the agreement between Becton and the GPOs setting up this whole arrangement, which says at Joint Appendix 3296, quote, that the supplier, quote, makes available for purchase by the authorized distributors for resale to the It doesn't change the MedStar-Cardinal agreement at 3004 in the Joint Appendix, which says that price, quote, is to be determined solely between MedStar and Cardinal. It doesn't change the MedStar agreement with Allegiance, which was Cardinal's predecessor, at page 3051, where the parties agree that their relationship is one of independent buyer and seller, and precisely this point was dealt with in the St. Francis case where they had precisely this type of form that referred to multiple sales and agencies and so forth. That's at footnote 49 of page 1105 of St. Francis, and we have that form itself in the record at Joint Appendix 3614. It is virtually identical. I'd also like to very briefly respond to something that's in Judge Linares' opinion that wasn't mentioned today, but it's important. Judge Linares said that the hospitals paid Becton and cited an interrogatory answer of ours. That interrogatory answer was a mistake. We told the court that. It's at docket entry 385, page 18, and they know that. You're informing the court, appears there. I'm sorry? You're informing the court of the mistake, appears there in the record. Well, we did before his opinion. We told him that was a mistake, and I just would like to say that our friends obviously know that it was a mistake. Of course, although in their brief they twice quote that interrogatory answer, they never affirmatively assert that they pay us because they know it's not true because they're so testified. For example, their 30B6 witness testified, and this is 2042 of the Joint Appendix, quote, for all units of Becton Dickinson hypodermic products MedStar ever received, MedStar paid Cardinal Health or some other distributor, right, answer, correct, if they came through a distributor. So they acknowledged they pay the distributor, and that was just a mistake. I wanted to make sure it was clarified. Would the court like me to address the issue of our change in positions? No. I think your time is up. Thank you, Mr. Stillman. I would just conclude by saying this is an interesting discussion, but it demonstrates the need for a bright line rule. Once you determine who the first buyer is, that's the end of the discussion. And what the insurance is, what all of these complications are, is exactly what the Supreme Court and this court and Warren General determined we should not have to look at. Thank you. Thank you. Thank you very much, counsel. The case was well argued and vigorously so, and we'll take it under advice.